Good morning, Your Honors. My name is Martin Robles-Avila. I'm a counsel for the petitioner, Janet Holling-Colewinder-Cardall, who are husband and wife in this case. I don't mean to distract you too much at the outset, but your case also raises a similar notice issue. Exactly, Your Honor. This case is – I'm just – keep in mind what we've already heard from the prior case. Sure, and I think this case is distinctly distinguishable on the facts because this petitioner, unlike the petitioner before, never received advisals in the immigration court because he, on his own, voluntarily, selflessly confessed before the IJ, before he ever walked into proceedings, that he had in fact filed an application that contained fabrications. And he said that he did so under duress and under advice of another – of a lawyer. So that excuses his fraudulent application? Well, I don't – well, I mean, we're not here to say – Is that your point? We're not here to say that he should be rewarded, but he should be punished less severely. And certainly, the – his acting under the influence of counsel should be taken into consideration, Your Honor. And I think it's important to look at – in this case particularly, he went to see a lawyer three days after he arrived in the United States. He had just – he had been living in the Philippines and in India for most of his life, two nations that are not known to act in accordance with the rule of law. And he met with this attorney. He told him, this is my claim. This is basically my application. And the attorney – And they said it wasn't good enough. They said – exactly. This is going to get you nowhere. This is – you need to do this, this, and that. And this is the way – You need to tell a big lie if you want to do it. And he says, okay, let's tell a big lie. Well, I don't think it's that simple, Your Honor. I think you have to – Well, it's just about that simple, isn't it? Take into consideration the fact that he had just arrived in this country. And this Court has previously noted the precarious – And, you know, I don't think we can take judicial notice that there's no rule of law in India or in the Philippines. But anyway, beyond that – Well, I mean, I think it – He's saying I – he's saying I'm used to being a big liar when I deal with government. And therefore, I'll tell a big lie and that's okay. No, but I think that he – that him going to a lawyer who was presumed to be an expert in immigration law, telling him this is the way things are done, he believed him. Well, furthermore, as the BIA pointed out, nobody even tried to touch the Lozada approach here. So there's nothing in this record – Did the – There's nothing in this record where the lawyer's been told – You know, this guy said that you told him to go in and commit perjury. That's how the record is. He says the lawyer told me and so I committed perjury. That is true, Your Honor. There's nothing in the record that – But there's nothing also in the record that the IJ disbelieved any of it. She believed all of it. And, in fact, that's how she found that he filed a frivolous application. She believed everything he said with respect to the circumstances of the creation of the asylum application and the interpreter's involvement even at the asylum interview. But all he's telling the IJ is that, you know, my lawyer made me do it. Well, that's part of it. But I think it's important if you look at the case of Lazar v. Gonzalez, where the court faltered. The Petitioner did the same thing. He said, I acted under the influence of my attorney, and that should excuse me to some extent. Although that Petitioner had multiple warnings, we only had that warning on the asylum application and at the asylum interview. But the court faulted him and said, well, you knew all of this stuff. Why didn't you come clean with this stuff before? You had multiple opportunities to do so, and you didn't, as if that would be a good thing. And I think it would be a good thing. And that's what our Petitioner did. He did come clean long before. He met with an attorney afterwards. The attorney told him, you can't do this. We're not going to do this. And so he walked into removal proceedings with a declaration asking for basically forgiveness for what he had done. And I think that forgiveness should be available in a context like this where the Petitioner, before he goes to the place where there are perhaps all the accoutrements and the trappings of the judiciary and immigration court, whereas the asylum office, and I'm not trying to excuse him. I mean, he himself confessed. Why would I make excuses for him? But I think it is important to note that there should be a difference between testimony or any statements that were made at the asylum office. And if ever you were going to draw a bright line and say you should come clean and you should encourage people to come clean and confess, it would be this line. Well, where does that appear in what Congress has told us? How are you going to work that out? I'm saying that – I mean, how are we going to work that out? Are we going to cause some kind of equitable tolling? Well, no, but I think that if you were to draw a bright line, these are the perfect facts for you to draw a bright line and say – You can lie until what? Well, that's – well, I mean – I mean, you want the bright line. The bright line will be it's okay for you to do these things. I think that you have to – It's okay to do this until what day? Well, I mean, there are two things. I think you have to look at the circumstances. And I think you also have to look at how – what would you want to encourage people to do. You want to incentivize people. I mean – Excuse me. When you say look at the circumstances, that sounds like, you know, here's a five-factor pragmatic test for circumstances. That doesn't sound very much like a bright line. You said there should be a bright line. I'm just saying where do you want to draw it? What I meant by that is that between the asylum office and removal proceedings. And I said that what I meant by the bright line is a line between any testimony – anything that happened at the asylum office because that's where you have, as the prior petitioner said, that's where you have interpreters who are either friends or family members or people that are, as in this case, are actively involved in preparing the fabricated application. So as we argued, you can't really trust whether or not he received any of these advisers and what was actually said. And, in fact, there was even testimony at the immigration court that during the interview, the interpreter would say to him, I'm going to answer this question. Don't answer this question. And he would himself answer for him. You know, I understand all that. I just – where did you say the bright line was? That's all I'm asking. The line should be between the asylum office and the immigration court. So any time up to the moment the I – you're in front of the IJ, if you withdraw, then that should be okay. Is that right? That's not necessarily what I'm saying. What I'm saying is that you should have a policy that would encourage people to come out. If you rule against this petitioner, then you're telling all future petitioners that there's no benefit to confessing. Because you know we're something if you go to court and roll the dice and see what happens. So this bright line is grounded in some sort of equitable concept? It's just – it's – yes. You have to – you have to base your argument or ground it on some sort of statute or regulation, case law, board decision. Well, here it would be – And you just want us – you just said, you know, we need a policy. We don't. I have to say it, but it's not our – we're not supposed to. Well, I think here what we're – We can't say – I mean, it would be improper for us, wouldn't it, to say, you know, we think it's a good idea, this is what you ought to do, agency, and we're going to do it for you. We argued that the notice at the asylum office was insufficient in part as a consequence of the fact that the interpreter was involved, as well as the fact that frivolous Under the facts of your particular case, your client, Mr. Dole, admitted that he knew from the outset that it was a fabricated asylum application. He knew it was wrong. It was only at best 50 percent factually accurate, but he did it anyway. That is correct, Your Honor. And then at some point he reversed course and he confessed, and we think that that should have some meaning if only under the four factors in YL. The fourth one is that you'd be given an opportunity to explain the circumstances or that you – and in this case, I don't think that she sufficiently took into account what he said, although she believed him. She believed in her mind, the judge, that she really had no choice. If the advisals were given, then I'm mandatorily obligated to render this decision. And that actually brings up a Second Circuit case, the Jiang v. Holder case, where they remanded based on the fact that the judge had some misgivings about imposing the permanent bar, but decided – went ahead and imposed them, and the circuit said, well, you do have – you do have the right to impose the permanent bar, notwithstanding statutory and regulatory requirements have been met. Is it a bar to withholding or convention against torture? It is not a bar to withholding. It is not, is it? It is not, Your Honor. So as a matter of fact, if the person is really a good guy and has a – and he has a believable story, et cetera, et cetera, at the end of the day, at least he could be granted withholding or convention against torture relief, correct? That is correct, Your Honor. And that was another argument. And if the I.J. really believed all that, that he's really got a good story when I'm – now that I've taken it all together, the I.J. could still grant withholding in a proper case, correct? That is correct, Your Honor. And as I was saying, we made the argument in our brief that the judge didn't really consider withholding because she went straight from the frivolous. She spent about 16 pages on the frivolous aspect of the case, and then she spent about three cases on the convention against torture, and she kind of skipped over the withholding of removal case. Would you like to save some time for rebuttal? Yes, Your Honor, I will. Thank you, Your Honor. Thank you. May it please the Court. My name is Lauren Fassette, and I represent the Respondent, the United States Attorney General. As this issue has been discussed throughout the morning, the facts of this case support the agency's finding that the Petitioner received notice of the consequences of filing frivolous application. There's no dispute that he filed the frivolous application, that it was completely fabricated. He has admitted that. There's no dispute that he knew that the facts were lies. There's no dispute that he knew from the beginning that he participated in creating the story, that he practiced the story with his attorney and his interpreter, that he signed the application under the warnings indicating the consequences for filing the frivolous application. But he fessed up. Does that count for anything? No, unfortunately. Let me put it another way. Sure. So he fesses up to the immigration judge when he gets there. And nonetheless, the I.J. says, well, no, you filed the frivolous application within the meaning of the statute. Is the I.J. obligated, does she have any, or does she or do you have any discretion on whether or not to impose the? Yes. The immigration judge has discretion to decide whether the application was frivolous. No, but suppose they say, oh, frivolous, just a, you know, it's just a blatant lie. But nonetheless, there are others. You're married. You've got children here and there's other factors. Do they have discretion not to impose the bar? Once the immigration judge makes the frivolous finding, then no, the bar would apply because it says that, you know, if you look at 208d6, if the attorney general determines that they knowingly made a frivolous application and the alien received the notice, then the alien shall be permanently ineligible. So if the I.J. So does the I.J. then have some discretion, even if, you know, she says, oh, you know, this is blatant and it's not true, and nonetheless, you came in and you fessed up and, you know, looking at everything. I shouldn't have done this, but nonetheless, I'm not going to find that, I'm not going to make a frivolous finding. Can the I.J. do that? I believe the I.J. does have discretion to do that, correct. However, in similar cases where someone has come and either fessed up or it's been discovered on cause examination that the claim was frivolous, and they say, immigration judge, I would like to withdraw my application. This Court in Chen has specifically said even at that point, even if the immigration judge says, fine, I'll let you withdraw the application, they can still make the frivolous finding that would bar the alien from future benefits. I'm just practically speaking, you know, like we had that earlier case, and I'm sure there's circumstances here as well, but, you know, somebody who has a family and children and a wife and everything, and the I.J., you know, just thinks, well, you know, maybe I shouldn't impose it. Maybe I shouldn't make the finding. And you're telling me they have discretion to do that. Well, the immigration judge does have discretion. But in this case, you know, that wasn't what happened. So I can't speak to what they would do in other cases. No, I understand. I don't understand what you mean by discretion. You mean, what do you mean? Unreviewable discretion? So the administrator, so the ALJ, the I.J. can say, in your view, no question. This is perfectly frivolous. Notice of perfect. Everything's perfect. Is the government's on the other side saying, lookit, this is a perfect, this meets all the elements. It's a frivolous application. You've got to apply the bar. And I believe you just said, oh, the I.J. can say, no, I don't think I will. Is that correct? No, that's not what I mean. I think that the immigration judge has discretion to consider what is before the court and the evidence. But once, if the immigration judge says, I think this is a frivolous application, then it's my understanding of the statute that they shall impose the bar. Well, now you're confusing me with what's before the court. The guy comes in and he lays out all the facts of what makes this an obviously frivolous application. Everything fits. And he says, but you know, I have a wife and a family and my child has kidney disease. And the I.J. says, okay, I'm not going to make a frivolous finding. That's okay? In your view? I'm not saying whether they have power to say that. You know, they're thousand-pound gorillas maybe in the courtroom. They can say it. But are you saying that? And then if it's appealed to the BIA, that's just tough. That's it. Because the I.J. said it? No, I'm sorry. I think I've mis-explained myself. I, you know, during the course of the proceedings, the immigration judge handles his courtroom in specifics of each case. But, no, there is no statute or regulation saying the immigration judge has discretion to not make the frivolous finding if they think that the application was frivolous. And I don't, I can't cite any cases that have said that. But, particularly, I can't speak to what immigration judge in his courtroom in other cases. I just know in this case the immigration judge was convinced that this was a frivolous application. Obviously, the petitioner admitted that it was frivolous. And the immigration judge found that he had received notice. And that is supported by substantial evidence in the record. He admitted that he knew that it was fraudulent and that he understood it was wrong and that there would be consequences for his lie. The written notification on the asylum application gave the notice of the consequences of filing the application. Do you have any additional arguments or any light to shed on how the agency construes the term at the time of filing that's written in the statute? Well, that was, again, not at issue in this case. So it was not specifically addressed. But I would say that the previous discussion by Respondent's Counsel, that at the time of filing is when it's received by the asylum office, is appropriate because that is when the application takes effect and benefits would stem from it, possibly getting a work authorization. And how else – you know, the statute says at the time of filing the application the Attorney General shall advise of the consequences of making a frivolous finding. And that is the whole point. I mean, right then when they're making this fabricated claim and signing it saying they know and that it's true, they need to know the consequences. But the BIA hasn't specifically construed it to be that way, to your knowledge? The BIA has implied that the written warnings are sufficient, but the cases before the BIA dealing with this topic have not been a notice issue with prong one under a matter of YL. They've been talking about the sufficiency of notice that a frivolous finding was going to be made and whether the alien had opportunity to respond. So, no, the Board has not said that. But the statute is clear that the Attorney General just has to advise the alien of the consequences of making the filing at the time of filing. And then the finding of frivolous application can be made if the Attorney General determines that the alien knowingly made the frivolous application and received notice under 4A, which just said that they have to be advised. So, as the Tenth Circuit said in Rebus, which was discussed earlier, the written warnings on the asylum application that are in bold and that clearly state that the consequences of making a frivolous application will result in permanent bar from immigration benefits is sufficient notice. And that wouldn't preclude the BIA from saying, well, it's a two-step process, would it? I'm sorry, I don't understand. Well, so the statute, this may comply with the statute, but why couldn't the BIA say, well, we're going to interpret a time of filing to mean not only filing the application, but also when he appears before the asylum officer? Well, yes, the BIA has the authority to interpret the statute, correct. You have to read the two. You have to the two go together in order to constitute a filing. That is a possibility, but the Board has not done that. And I would suggest that the statute and the regulations do not imply that. Do you think if they were to do that, that would be blatantly inconsistent with the statute? To say that they have to receive the warnings? Both. At both places. At the time of filing, when they submit it, and when they show up at the asylum office. I think it would be. Because would we owe Chevron deference? Sorry? In other words, would we owe Chevron deference? Well, if the Board published a case on that, then, yes, it would, the Court would owe Chevron deference. But I do not think the statute says that. I mean, there isn't a two-part. It's just at the time of filing, which is when they submit the application and it's received by the office. Because that's when, you know, how many, as was discussed, how many times can an alien present a lie and have no consequences? The point of this is to discourage lying from the beginning, not to confess later when things aren't looking good. No, but I mean, you know, it's on the application. They want to make, you know, there is a severe consequence, especially for. Sure. You know, there's families involved, U.S. citizen children and whatnot. Right. And those are not the facts here, but, yes. You have to be extra certain on the application, but, you know, you also have to be given the warning by the asylum officer when you first appear and swear, like Mr. Joe was arguing in the other case. Even if that were good practice, that is not what the statute says or requires. There's nothing in the statute. I understand that, but I'm just, my question was more of a Chevron-type question, which is. I agree that. If you can say that that term is ambiguous, we certainly wouldn't want to foreclose that possibility that the Board could interpret it that way. I agree. And I would say that at that point you would send it back to the Board to issue an opinion on that in the first instance. But here in this case, that's not necessary because there is just the evidence fully supports that this Petitioner received the notice. He received it on the asylum application, and then, in fact, he signed the record of application of the oath before the asylum officer, which again had the warnings. And then he testified before the Court that he understood the consequences and that he knew he was making a frivolous finding. So here the record of evidence fully supports that this Petitioner received notice of the consequences and supports the agency's finding that he made a frivolous asylum application, and thus they impose the permanent bar. And this was, as Petitioner admits, a completely fabricated claim. This wasn't a small embellishment or anything close to just an adverse credibility. I mean, this was being arrested and tortured in India when he was never arrested and, in fact, was living in Germany at parts of the time. And he admits that he made up at least 50 percent of it on his own, and only half of that was true. So here I see no way that the Court would be compelled to say that he didn't receive notice or that he didn't make a frivolous asylum application. And I know that it's not at issue, well, it hasn't been discussed this morning, but following that, the heightened standard for making the frivolous finding would clearly go to that he also was adversely credible and support the immigration judge's finding there, that even beyond the frivolous finding, his testimony was adversely credible. There were many issues and inconsistencies. So here the petition for review should be denied. Thank you, Your Honor. Roberts, you had a few moments. Just a couple of points. First of all, in this case, the IJ did say that. I mean, her language, the things she said, that she felt she had no choice, she had no discretion not to impose it. She said, she said, I do not think that the language is ambiguous. It says shall. So that's just one point that under Zhang, that would be a point we would request that it could be remanded on. As far as the adverse credibility determination in the second or the amended asylum application, the judge spent the whole, the entire hearing on the frivolousness warnings, and she never really asked him anything else. There were never any follow-up questions. And under this Court's precedent, she's obligated to ask, well, why didn't you do this, put this in the declaration? Why didn't you tell this to the psychologist, et cetera? So he never had an opportunity to essentially revive her adverse credibility determination. And unless there are no other questions, Your Honor, thank you for your time. Thank you, Mr. Robles-Avila. Thank you, counsel. We appreciate your arguments. They're helpful. This matter is submitted and our session. We're going to have some photographer come up here for just a moment, but you guys are free to leave. And thank you all very much.
judges: Fernandez, Paez, Nguyen